IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHELLE A. ZEIGLER,             )       CASE NO. 1:13-cv-00457
                                 )
              Plaintiff,          )       MAGISTRATE JUDGE
                                 )       KATHLEEN B. BURKE
         v.                      )
                                 )
COMMISSIONER OF SOCIAL           )
SECURITY ADMINISTRATION,         )
                                 )       **MEMORANDUM OPINION & ORDER**
              Defendant.          )

 

Plaintiff Michelle A. Zeigler ("Plaintiff" or "Zeigler") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her application for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 14.  Because the Administrative Law Judge's

("ALJ"), explanation for the weight provided to Zeigler's treating orthopedist specialist Dr.

Robert D. Zaas's March 17, 2011, and October 29, 2011, opinions does not allow this Court to

conduct a meaningful review of the Commissioner's decision, the Court is unable to conclude

that the Commissioner's decision is supported by substantial evidence.  Accordingly, the Court

**REVERSES AND REMANDS** the final decision of the Commissioner for further proceedings

consistent with this Opinion and Order.

## I.  Procedural History

Zeigler filed an application for Disability Insurance Benefits ("DIB") on or about

December 20, 2010.  Tr. 10, 77, 146.  She alleged a disability onset date of March 26, 2010 (Tr.

77, 87, 146) and claimed disability because of depression and injuries and pain to her left

shoulder, left hip, left ankle, lower back, spine, and neck.[1]  Tr. 26, 77, 87-88, 99, 104, 217.  After initial denial by the state agency (Tr. 99-103), and denial upon reconsideration (Tr. 104-110), Zeigler requested a hearing (Tr. 111).  On February 3, 2012, ALJ Patrick  J. Rhoa ("ALJ") conducted an administrative hearing.[2]  Tr. 22-76.

In his May 24, 2012, decision (Tr. 7-21), the ALJ determined that Zeigler had not been under a disability from March 26, 2010, through the date of the decision.  Tr. 10, 17-18.  Zeigler requested review of the ALJ's decision by the Appeals Council.  Tr. 6.  On January 31, 2013, the Appeals Council denied Zeigler's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.       Personal, educational and vocational evidence

Zeigler was born in 1960.  Tr. 146, 167.  She completed high school and obtained a two-year business degree from Bryant and Stratton.  Tr. 32-33, 172.  Her past work included work as a letter carrier, legal secretary, accounting clerk, bookkeeper, data-entry clerk, and receptionist.  Tr. 68-69, 179-194, 210-211.  Zeigler lives alone.  Tr. 28.  She has three adult children and is divorced.  Tr. 28.

### B.       Medical evidence

#### 1.       Treatment history

*Physical impairments*

---

[1] At the administrative hearing, Zeigler's counsel indicated that Zeigler's issues were mostly related to degenerative disc disease of the lumbar spine and depression.  Tr. 26.

[2] The front page of the hearing transcript indicates that the hearing was on February 3, 2013.  Tr. 22.  At the start of the hearing, the ALJ stated that the hearing was "being held in Cleveland, Ohio on February 3, 2010." Tr. 24.  The hearing decision states that the hearing was held on February 3, 2012.  Tr. 10.  The Notice of Hearing, which is dated December 6, 2011, states that the hearing will be held on February 3, 2012.  Tr. 119.  The date of February 3, 2012, appears to be the correct date of the hearing.

On August 23, 1997, Zeigler injured her neck, back, arm, wrist, hip and ankle[3] while employed by the U.S. Post Office.  Tr. 247, 252.  While delivering mail, on August 23, 1997, Zeigler was attacked by a dog, which caused her to fall against a tree and sustain injuries on her left side. Tr. 253, 256.  She has had a number of surgeries, including left shoulder surgery (2000), right elbow surgery (2002), and arthroscopic ankle surgery (2002).  Tr. 246, 259, 261. Dr. Robert D. Zaas, M.D., began treating Zeigler for her injuries in 1997 and continued to treat her through 2011.  Tr. 220, 251, 292.

On August 24, 2011, because of complaints of continuing pain in her lower back, left hip and left thigh, Dr. Zaas indicated that he suspected a lower lumbar disc herniation or degeneration.  Tr. 295.  He also stated that he could not rule out the presence of trochanteric bursitis or an intrinsic left knee condition.  Tr. 295.  Dr. Zaas ordered an MRI scan of Zeigler's lumbar spine.  Tr. 295.

On August 26, 2011, the MRI scan was performed. Tr.  294.  The MRI scan showed normal discs at L1-2, L2-3, and L3-4 but revealed a disc bulge at L4-L5 and L5-S1, which was further described as:

> At L4-L5 level, the disc space is narrowed.  The disc is dehydrated.  There is broad-based disc bulge with associated facet hypertrophy.  The combination of findings leads to bilateral neural foramina narrowing with impingement on the right nerve roots.  No central spinal canal narrowing is noted.
>
> At L5-S1, the space is narrowed.  The disc is dehydrated.  There is a broad-based disc bulge, which narrows bilateral neural foramina and impinges on bilateral nerve roots.  No central spinal canal narrowing is seen.

Tr. 294.

---

[3] Zeigler also had an ankle injury in 1986.  Tr. 220, 247.

Following the August 26, 2011, MRI, on August 30, 2011, Zeigler saw Dr. Zaas.  Tr. 296.  Dr. Zaas indicated that the MRI showed normal discs at L1-2, L2-3, and L3-4.  Tr. 296.  He also stated that:

> * * *
>
> There was a degenerative signal and disc space narrowing at L4-5 where there is also a broad based disc bulge, as well a facet hypertrophy.  At L5-S1, there is also a degenerated signal and disc space narrowing with a broad based bulge associated with narrowing of the foramina and impingement on bilateral nerve roots.
>
> The findings are consistent with degeneration and disc bulging at L4-5 and L5-S1.  According to the MRI scan report, there was more foraminal impingement on the right side at L4-5 than on the left.  I acknowledge that primary complaints on August 24, 2011 related to left lower lumbar, lateral hip and thigh pain.

Tr. 296.

As indicated, on August 30, 2011, Dr. Zaas noted that the August 26, 2011, MRI showed evidence of impingement of the nerve roots.  Tr. 296.  However, a few weeks later, on September 15, 2011, when discussing the August 26, 2011, MRI scan, he stated that the MRI scan "showed degenerative signals and disc space narrowing with bulging at L4-5 and L5-S1 but without evidence of associated nerve root compression."  Tr. 293.

*Mental impairments*

In 2011, Zeigler saw counselor Susan Marder.  Tr. 298-304.  On September 6, 2011, Zeigler reported being extremely stressed about things in her life.  Tr. 303.  She indicated that her brother lived about 10-15 minutes away from her and she had been caring for him after he had suffered a stroke.  Tr. 303.  She was running errands and doing medication checks for him.  Tr. 303.  She also reported feeling estranged from her family.  Tr. 304.  Zeigler had not been taking an anti-depressant but was willing to have a referral for medication management.  Tr. 304.  She reported that she tended to isolate

herself and preferred to be alone.  Tr. 304.  Zeigler's goals following her September 6, 2011, session with Ms. Marder were to "alleviate depressed mood and return to previous level of effective functioning."  Tr. 304.

On October 4, 2011, Zeigler reported that her brother had fallen and was in a rehabilitation facility.  Tr. 301.  Zeigler indicated that she was anxious about driving because she could not handle traffic.  Tr. 301.  Ms. Marder noted that Zeigler recognized that she was a "slow mover" and Ms. Marder assisted Zeigler in developing coping strategies such as being more assertive and expressing her anger more.  Tr. 301.  Ms. Marder also encouraged Zeigler to increase her involvement in pleasurable activities such as socializing more at church and accompanying her daughter and 16 year old granddaughter on a trip to Disneyworld in May 2012.  Tr. 301.  Ms. Marder and Zeigler discussed other possibilities of income while awaiting a social security disability determination.  Tr. 301.

On October 25, 2011, Zeigler reported that she was having difficulty following work assignments and indicated that she had been fired from two recent part-time jobs because she was not able to grasp new skills.  Tr. 300.

On November 22, 2011, Zeigler indicated that she had been having problems because multiple family members were having serious health problems, including her son, brother and niece.  Tr. 299.  Zeigler acknowledged that she was overwhelmed with family responsibilities and indicated that she felt that no one else in the family was volunteering to help.  Tr. 299.

On December 14, 2011, Zeigler reported that her son was doing better and her brother had returned home from rehabilitation.  Tr. 298.  Ms. Marder reinforced Zeigler's efforts to establish a better relationship with her family.  Tr. 298.

### 2. Opinion evidence

#### a. Treating medical providers

*Robert D. Zaas, M.D.*

Dr. Zaas, a specialist in orthopedic surgery, treated Zeigler for a period of approximately thirteen years.  Tr. 220, 251.  He provided a number of opinions with respect to her physical impairments.  Tr. 220, 252, 269-270, 290-291.

On February 13, 2003, Dr. Zaas indicated that he had treated Zeigler for the prior six years for diagnoses of left wrist sprain; left shoulder sprain and anterior impingement; supraspinatus tendonitis and rotator cuff tear; contusion left hip; cervical and lumbar sprain with post traumatic myofascitis reaction, predominating at both levels on the left side; right ulnar nerve impingement at the elbow; and left ankle lateral ligament injury resulting in lateral recess scarring.  Tr. 220.  He recommended certain restrictions, including lifting/carrying restrictions, reaching restrictions, standing restrictions, and postural restrictions.  Tr. 220.  Because of her multiple impairments, Dr. Zaas stated that Zeigler was very limited in what she could do at work and he supported her desire to be placed on retirement disability.  Tr. 220.  He indicated that Zeigler's prognosis was guarded and her disability was permanent.  Tr. 220.

In connection with Zeigler's application for social security disability benefits, on January 31, 2011, Dr. Zaas completed a form for the Bureau of Disability Determination regarding Zeigler's physical impairments.  Tr. 251-252.  Dr. Zaas indicated that Zeigler

had injured her neck, back, left shoulder, arm, wrist, hip and ankle when she fell at work in 1997.  Tr. 252.  Dr. Zaas indicated that any motor loss, described as including sensory deficit, muscle weakness and reflex abnormalities, and any muscle spasms, muscle atrophy or symptoms of radiculopathy mainly occurred in Zeigler's left shoulder and arm.  Tr. 252.  He also indicated that Zeigler had limited motion in her left shoulder, neck, back, wrist and ankle.  Tr. 252.  He stated that her fine and gross manipulation were normal as was her gait.  Tr. 252.  Zeigler did not require the use of an ambulatory aid. Tr. 252.

A few months later, on March 17, 2011, Dr. Zaas completed a form wherein he set forth his opinion with respect to how Zeigler's ability to perform work-related abilities was affected by her impairments.  Tr. 269-270.  Dr. Zaas opined that Zeigler was limited to lifting/carrying 5-10 pounds because of her left shoulder, neck and back pain. Tr. 269.  He opined that Zeigler's ability to stand/walk was limited to standing/walking without interruption for 30 minutes and for a total of 2-3 hours in an 8-hour day.  Tr. 269. He opined that Zeigler's ability to sit was slightly limited.  Tr. 269.  Zeigler could sit for 1 hour without interruption and for a total of 6 hours in an 8-hour workday.  Tr. 269.  Dr. Zaas opined that Zeigler could occasionally climb, balance, stoop, crouch, kneel and crawl.  Tr. 270.  He also opined that Zeigler had limitations with respect to reaching (with her left arm), handling, and pushing/pulling.  Tr. 270.  As for environmental limitations, Dr. Zaas opined that Zeigler was slightly limited in her ability to handle heights.  Tr. 270.

On October 29, 2011, Dr. Zaas completed a form that was similar to the form that he had completed on March 17, 2011, but he opined that Zeigler was more limited than

she had been in March 2011.[4]  Tr. 290-291.  Dr. Zaas opined that Zeigler was limited to

lifting/carrying 5 pounds because of low back, neck and thigh pain; lumbar disc

degeneration; left rotator cuff (surgery); status post surgery left ankle and right elbow.

Tr. 290.  He opined that Zeigler's ability to stand/walk was limited to standing/walking

without interruption for 15 minutes and for a total of 2-3 hours in an 8-hour day.  Tr. 290.

He opined that Zeigler's ability to sit was limited to sitting for 20 minutes without

interruption and for a total of 2-3 hours in an 8-hour workday.  Tr. 290.  Dr. Zaas opined

that Zeigler could occasionally climb and balance but she could never stoop, crouch,

kneel or crawl.  Tr. 291.  He also opined that Zeigler had limitations with respect to

reaching (with her left arm), handling, and pushing/pulling.  Tr. 270.   As for

environmental limitations, Dr. Zaas opined that Zeigler was not limited.  Tr. 291.  In

response to a question regarding how much Zeigler would likely be "off task" during the

workday, Dr. Zaas indicated that Zeigler was "totally disabled."  Tr. 291.  Also, in

response to a question regarding how many days per month Zeigler would likely be

absent from work because of her impairments, Dr. Zaas indicated that Zeigler was

"totally disabled."  Tr. 291.

*Susan Marder, PCC*[5]

On October 25, 2011, Ms. Marder completed a Medical Source Assessment

(Mental).  Tr. 288-289.  She rated Zeigler's work-related abilities in 20 categories.  Tr.

288-289.  In all but 2 categories, Ms. Marder indicated that Zeigler would either be

unable to perform the tasks, have noticeable difficulty performing tasks for more than

---

[4] Both the March 17, 2011 (Tr. 269-270), form and October 29, 2011 (Tr. 290-291), form include Questions 1 through 6.  Two additional questions (Questions 7 and 8) were asked and answered by Dr. Zaas on the October 29, 2011, form.  Tr. 291.  There was a Question 7 on the March 17, 2011, form but it was unanswered and not the same as Question 7 on the October 29, 2011, form.  Tr. 270, 291.

[5] "PCC" appears to stand for Professional Clinical Counselor.

20% of the work day or work week, or have noticeable difficulty performing tasks for 11-20% of the work day or work week. Tr. 288-289. In 2 categories (ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes and ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness), Ms. Marder indicated that Zeigler would not be limited. Tr. 289. Ms. Marder also indicated that, as a result of her impairments, if Zeigler was trying to work full time, she would likely miss more than 4 days each month. Tr. 289.

> She summarized Zeigler's General Functional Capacity Assessment as follows:

> Client has been having extremely difficult time holding any part-time or temporary positions due to inability to learn new job-related skills; according to client she has been told that she is too slow in completing task; has problems with transitions and adjusting to new situations; she does not take public transportation or go to venues with crowds; unable to recall instructions on jobs; this has caused her to be fired from all recent jobs.

Tr. 289.

### b. State agency physicians

*Gary Hinzman, M.D.*

On February 3, 2011, state agency reviewing physician completed a Physical RFC Assessment. Tr. 81-82. He opined that Zeigler had the following exertional limitations: occasional lifting/carrying of 20 pounds; frequent lifting/carrying of 10 pounds; ability to stand and/or walk (with normal breaks) for about 6 hours in an 8-hour workday; ability to sit (with normal breaks) for about 6 hours in an 8-hour workday; ability to push/pull limited in left lower extremities (frequent use of foot controls because of history of left ankle surgery and continued discomfort). Tr. 81-82. Dr. Hinzman opined that Zeigler had the following postural limitations: frequent climbing of ramps and stairs; no climbing

ladders, ropes, and scaffolds because of surgery on left ankle and continued discomfort

with left hip and back; unlimited balancing; and occasional stooping, kneeling,

crouching, and crawling.  Tr. 82.  Dr. Hinzman opined that Zeigler was limited to

occasional reaching with the left arm in any direction, including overhead, because of

decreased range of motion of the left shoulder.  Tr. 82.

> _W. Jerry McCloud. M.D._

On May 9, 2011, state agency reviewing physician Dr. McCloud completed a

Physical RFC Assessment.  Tr. 93-95.  Dr. McCloud reviewed the medical evidence in

the file and affirmed Dr. Hinzman's February 3, 2011, RFC Assessment.  Tr. 94.

**C.      Testimonial evidence**

> **1.      Zeigler's testimony**

Zeigler was represented and testified at the administrative hearing.  Tr. 27-66.   Zeigler

indicated that her three adult children live in the area and she sees her family every day.  Tr. 29.

They come to visit her at her house.  Tr. 29.  She has two grandchildren, ages 6 and 15.  Tr. 29.

If necessary, she watches her grandchildren on the weekends.  Tr. 29-30.  Her 15 year old

grandchild helps with the 6 year old.  Tr. 30.

Zeigler has a driver's license but she is afraid to drive because of the medication that she

takes which includes Valium twice each day.  Tr. 30-31.

In 2005, Zeigler obtained a two-year business degree from Bryant and Stratton.  Tr. 32.

She majored in business and minored in accounting.  Tr. 32-33.   She has used her accounting

degree at a number of different jobs.  Tr. 33.

Zeigler has never had a worker's compensation claim.  Tr. 33.  She was receiving

unemployment compensation at the time of the hearing.  Tr. 33.  She retired from the U.S. Post

Office under disability in 2003 and receives a disability retirement pension.  Tr. 34, 46.  She worked at the Post Office for 18 years.  Tr. 42.  She was injured on August 23, 1997.  Tr. 42.  A large dog got out of its fence and pushed her, pushing her left side against a tree.  Tr. 42.  She suffered injuries to her shoulder, knee, ankle, hip and wrist on her left side.  Tr. 42.  She had two surgeries on her shoulder, in 2000 and 2001.  Tr. 42-43.  She still has problems with her shoulder and her doctor indicated that she might have to undergo another surgery on her shoulder.  Tr. 43.  When she was attacked by the dog, she also hurt her ankle.[6]  Tr. 44.  As a result, she had to have surgery on her ankle.  Tr. 44.

With respect to her alleged disability onset date of March 26, 2010, Zeigler indicated that on that date she was let go from her job at Hartman Personnel.  Tr. 34.  She was working as an accounts payable specialist.  Tr. 35.  She stated that they let her go because she was not able to keep up with the work and was making mistakes.  Tr. 34, 36.  Zeigler indicated that she was fired from a data-entry position at Adecco in 2009 because there were budgetary problems and she was not keeping up with the work.  Tr. 36-37.  Also, in 2008, she was unable to keep up with her work at Mars Employment where she was doing data-entry work.  Tr. 37.  Early in 2008, she worked as a receptionist at For Rent Magazines in Georgia.[7]  Tr. 38.  She stopped working at For Rent Magazines because her boss was very aggressive towards her; he thought that she was not keeping up with her work and was slow.  Tr. 38.  She was not focusing because of the pain she was experiencing.  Tr. 38.  In 2006 and 2007, Zeigler worked at other jobs but was unable to keep up with the work at those positions.  Tr. 39-42.

---

[6] She also had a prior accident when she was delivering mail that resulted in an ankle injury.  Tr. 44.  She was coming down concrete steps and the steps collapsed beneath her.  Tr. 44-45.

[7] Zeigler's mother died in August 2007.  Tr. 38.  Thereafter, Zeigler's aunt asked Zeigler to move to Georgia to live with her and Zeigler agreed because she thought it would be a good change.  Tr. 38-39.

At the time of the hearing, Zeigler was looking for work.  Tr. 35.  She indicated that she did not think that she would be able to work a full-time job but, because of unemployment, she had to look for a job.  Tr. 35.

At times, she cannot walk because of the pain that shoots up and down through her leg.  Tr. 48.  She has to lie down or sit down for up to four hours at a time in order for the pain to ease up.  Tr. 48-49.  The Valium and Flexeril that she takes help relieve her pain some and sometimes she takes a bath to help ease the pain.  Tr. 49.  She can walk about 10-15 feet before having to stop and rest.  Tr. 52.  Zeigler indicated that, because of her problems with walking, her doctor scheduled an MRI.  Tr. 60.  Her doctor advised her that the MRI showed that she had two pinched nerves and that was why pain was radiating up and down her left leg and sometimes her right leg.  Tr. 60-62.  Her right side pain is milder than on her left side.  Tr. 61-62.

She is unable to reach above her shoulder.  Tr. 49-50.  She has had a problem with her right elbow as well which required surgery.  Tr. 50.  Because of the problem with her elbow, it is difficult for her to perform data-entry and work on a computer.  Tr. 50-51.  She cannot lift more than 5 pounds because of her shoulder problems.  Tr. 52.

She feels depressed because of the inability to keep jobs and from being told that she is too slow.  Tr. 53.  The pain in her back prevents her from being able to focus and causes her to make mistakes.  Tr. 53.  She stated that she feels depressed on a daily basis.  Tr. 53.  Sometimes she has worse days than others.  Tr. 53.  Her depression is really bad three or four days each week.  Tr. 54.  On days that she feels really bad she does not do her hair and does not leave her house.  Tr. 54.  She takes Cymbalta, Trazadone, Ambien and Zoloft for her depression.  Tr. 57.

Zeigler helps her brother who suffered a stroke.  Tr. 62.  She is his payee for his pension check and she takes care of that payment each month.  Tr. 64.  She pays his bills for him.  Tr. 63.

He has home healthcare but she helps him arrange his medical appointments and get his medication for him.  Tr.  62-65.  Her brother has other transportation to his medical appointments so Zeigler does not have to transport him.  Tr. 64.  If she has to go to the store for her brother, she has her daughter accompany her so she can help.  Tr. 64.

Zeigler's children visit her on a regular basis. T r. 64.  She very seldom visits with them at their homes.  Tr. 64.   She attends church by herself on Sundays. Tr.  64.  Since 2010, her average day involves waking up, drinking coffee, and playing games on her computer.  Tr. 66.  When she starts feeling pain, she lies down and rests.  Tr. 66.

### 2.        Vocational Expert's testimony

Vocational Expert ("VE") Mark Anderson testified at the hearing.  Tr. 66-74.   The VE described Zeigler's past work.  Tr. 68-69.  The letter carrier position was a medium level, semi-skilled position but Zeigler performed it closer to the heavy exertion level.  Tr. 68.  The legal secretary, accounting clerk, and bookkeeper positions were sedentary level, skilled positions.  Tr. 68-69.  The data-entry clerk and receptionist positions were sedentary level, semi-skilled positions.  Tr. 69.

The ALJ asked the VE a series of hypothetical questions.  Tr. 69-73.  The ALJ first asked the VE to assume a hypothetical individual the same age as Zeigler and having the same education and work experience as Zeigler who could perform a limited range of light work; no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs; no work at unprotected heights; no work around dangerous machinery; frequent foot controls; limited push/pull with the lower extremities; occasional left overhead lifting; occasional overhead reaching on the left side; occasional stooping, kneeling, crouching and crawling; frequent handling and fingering with the left hand; and would be off task 5% of the time.  Tr. 69-70.  The

VE indicated that the described individual would be able to perform Zeigler's past work as a receptionist, legal secretary, accounting clerk, and bookkeeper but be unable to perform Zeigler's past work as a letter carrier and data-entry clerk.  Tr. 70.  Also, the VE indicated that there would be other work available to the described individual, including (1) mail sorter, a light, unskilled job with 195,000 positions available in the nation, 9,500 in the state of Ohio, and 3,500 in northeast Ohio; (2) cashier, a light, unskilled job with 2.9 million positions available in the nation, 113,000 in the state of Ohio, and 22,000 in northeast Ohio; and (3) inspector and hand packager, a light, unskilled job with 235,000 positions available in the nation, 22,500 in the state of Ohio, and 4,500 in northeast Ohio.  Tr. 70-71.

As for the second hypothetical, the ALJ asked the VE to assume an individual with the same physical limitations as described in the first hypothetical but the individual would be limited to sedentary work with a sit/stand option every hour.  Tr. 71.  The VE indicated that the described individual would also be able to perform Zeigler's past work as a receptionist, legal secretary, accounting clerk, and bookkeeper.  Tr. 71-72.  Also, the VE indicated that there would be other work available to the described individual, including (1) document preparer, a sedentary, unskilled job with 180,000 positions available in the nation, 19,000 in the state of Ohio, and 4,000 in northeast Ohio; (2) credit information clerk, a sedentary, unskilled job with160,000 positions available in the nation, 10,500 in the state of Ohio, and 2,500 in northeast Ohio; and (3) charge account clerk, a sedentary, unskilled job with 154,000 positions available in the nation, 13,500 in the state of Ohio, and 1,500 in northeast Ohio.  Tr. 72.

As for the third hypothetical, the ALJ asked the VE to assume an individual who would be off task 20% of the time.  Tr. 72.  The VE testified that such a limitation would eliminate all work.  Tr. 72-73.

In response to questions from Zeigler's counsel, the VE indicated that, if an individual was limited to one to two step jobs, simple routine tasks, Zeigler's past skilled jobs would not be available to that individual.  Tr. 73.  The VE indicated that, if an individual was limited as described in the ALJ's first hypothetical with the additional limitations of only being able to stand two to three hours each day, sit two to three hours each day, and lift five pounds, there would be no work available to that individual.  Tr. 73-74.  The VE indicated that, if an individual had to consistently miss four days of work each month, the individual would be terminated from work.  Tr. 74.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[8] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

---

[8] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[9] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his May 24, 2012, decision, the ALJ made the following findings:[10]

1.      Zeigler met the insured status requirements through December 31, 2015. Tr. 12.

2.      Zeigler had not engaged in substantial gainful activity since March 26, 2010, the alleged onset date.  Tr. 12.

---

[9] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[10] The ALJ's findings are summarized.

3.    Zeigler had the following severe impairments: degenerative disc disease of the lumbar spine, cervical spine strain, and left shoulder sprain with impingement and rotator cuff tear.  Tr. 12.  Zeigler's depression was a non-severe impairment.  Tr. 12-13.

4.    Zeigler did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments, including Listings 1.02 and 1.04.  Tr. 13.

5.    Zeigler had the RFC to perform light work except that she can occasionally climb ramps and stairs but never ladders, ropes, scaffolds. She cannot work at unprotected heights or around dangerous machinery. She can only occasionally stoop, kneel, crouch, and crawl.  She can frequently use foot controls.  She has limited push/pull in the lower extremities.  She can occasionally overhead lift and reach with her upper extremity but can frequently handle and finger with the left hand.  She would be off task 5% of the time.  Tr. 13-16.

6.    Zeigler is capable of performing past relevant work as a receptionist, legal secretary, and accounting clerk because the work does not require performance of work-related activities precluded by Zeigler's RFC.  Tr. 16.

7.    Zeigler was born in 1960, and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.  Tr. 16.

8.    Zeigler has at least a high school education and is able to communicate in English.  Tr. 16.

9.    Transferability of job skills is not material to the determination of disability.  Tr. 16.

10.   Alternatively, considering Zeigler's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Zeigler can perform, including mail sorter, cashier, and inspector and hand packager.  Tr. 16-17.

Based on the foregoing, the ALJ determined that Zeigler had not been under a disability from March 26, 2010, through the date of the decision.  Tr. 17-18.

## V. Parties' Arguments

### A.      Plaintiff's arguments

Plaintiff presents three arguments.  First, Zeigler argues that the ALJ erred in his

consideration of and the weight provided to the March 17, 2011, and October 29, 2011, opinions

offered by her treating physician, Dr. Zaas, an orthopedist specialist who treated her for a

significant number of years.  Doc. 15, pp. 13-16; Doc. 17.  Second, Zeigler argues that the ALJ

erred in assessing her credibility.  Doc. 15, pp. 16-18.  Third, Zeigler argues that, because the

ALJ did not provide controlling weight to Dr. Zaas's opinion, the ALJ erred at Step Five by

relying upon an inaccurate VE hypothetical question.  Doc. 15, pp. 19-20.

### B.      Defendant's arguments

In response, Defendant asserts that the ALJ correctly concluded that the March 17, 2011,

and October 29, 2011, opinions of Dr. Zaas were inconsistent with each other, inconsistent with

Dr. Zaas's own clinical findings and not entirely supported.  Doc. 16, pp. 11-13.  Thus,

Defendant argues that the ALJ properly gave less than controlling weight to those opinions.

Doc. 16, pp. 11-13.  The Defendant also argues that, to the extent that the ALJ relied upon the

opinions of the state agency reviewing physicians to discount Dr. Zaas's opinions, the ALJ relied

upon other evidence as well.  Doc. 16, pp. 12-13.  The Defendant argues that the ALJ properly

assessed Zeigler's credibility and found her complaints not credible to the extent she alleged

symptoms that would preclude her from performing work within the ALJ's restrictive RFC.

Doc. 16, pp. 13-15.  Finally, the Defendant asserts that, because the ALJ properly declined to

give controlling weight to Dr. Zaas's opinions, the VE hypothetical upon which the ALJ relied

accurately portrayed Zeigler's limitations and thus the VE testimony constituted substantial

evidence in support of the ALJ's decision.  Doc. 16, p. 15.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be

conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42

U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn "so long as substantial

evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336

F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve

conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387

(6th Cir. 1984).

**A.     Since the ALJ's stated reasons for not providing controlling weight to the opinions of Dr. Zaas are not sufficiently explained, the treating physician rule is not satisfied and the Court is unable to find that the Commissioner's decision is supported by substantial evidence**

Zeigler argues that the ALJ violated the treating physician rule when he provided

"limited weight" (Tr. 15) rather than controlling weight to Dr. Zaas's March 17, 2011 (Tr. 269-

270), and October 29, 2011 (Tr. 290-291), opinions.[11]  Doc. 15, pp. 13-16; Doc. 17.  Further, Zeigler asserts that the ALJ provided insufficient analysis of his reasons for the weight he gave Dr. Zaas's opinions making it difficult to follow the ALJ's reasoning.  Doc. 15, pp. 13-16; Doc. 17, pp. 3-4.  Thus, Zeigler argues that the ALJ failed to adhere to the requirements of SSR 96-2p which requires that an ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  Doc. 15, pp. 13-16; Doc. 17, pp. 3- 4 (quoting SSR 96-2p).

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).

The Commissioner's regulations impose a clear duty always to give good reasons in its notices of determinations or decisions for the weight given to treating source opinions.   *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).  "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."   *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights [and] [i]t is intended 'to let claimants understand the disposition of

---

[11] The ALJ also provided no weight to Dr. Zaas's  February 13, 2003, opinion (Tr. 220) because it was remote in time, having been provided approximately seven years prior to Zeigler's alleged onset date (Tr. 16), and no weight to Dr. Zaas's opinion that Zeigler is "disabled" because such a determination is an issue reserved to the Commissioner (Tr. 15).  Zeigler does not directly challenge the ALJ's conclusions with respect to those two opinions of Dr. Zaas.

their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'" *Id.* at 937-938 (citing *Wilson*, 378 F.3d at 544).  Moreover, "the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'" *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-545).

Where a treating source's opinion is not provided controlling weight, certain factors must be applied by the ALJ to determine what weight should be given to the treating source's opinion.[12] *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

An "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole*, 661 F.3d at 939-940 (citing *Blakely v. Comm'r of Soc Sec*, 581 F.3d 399, 407 (6th Cir. 2009) (internal quotations omitted)).  Inasmuch as 20 C.F.R. § 404.1527(c)(2) creates important procedural protections for claimants, failure to follow the procedural rules for evaluating treating physician opinions will not be considered harmless error simply because a claimant may appear to have had little chance of success on the merits.  *Wilson*, 378 F.3d at 546-547.

In explaining his decision to provide "limited weight" to Dr. Zaas's March 17, 2011, and October 29, 2011, opinions, the ALJ stated:

> Although Dr. Zaas is an orthopedic specialist who has treated the claimant in the past, his opinions are inconsistent with one another as well as his clinical findings. He also fails to support some of the limitations listed in both opinions.

Tr. 15.[13]

---

[12] The factors to be considered are: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion.  *Bowen*, 478 F.3d at 747; 20 C.F.R. §§ 404.1527(d), 416.927(d).

As more fully explained below, considering the length of Dr. Zaas's treatment, the ALJ's summary statement as to why Dr. Zaas's opinions were entitled to only "limited weight" falls short of insuring that the procedural requirements of the treating physician rule were met in this case.

The ALJ summarily concluded that Dr. Zaas's March 17, 2011, opinion and his October 29, 2011, opinion are inconsistent with each other.  He did not identify the inconsistencies nor did he discuss the intervening MRI.  On August 26, 2011, upon Dr. Zaas's orders (Tr. 295), an MRI was performed (Tr. 294) between the issuance of his two opinions.  The August 26, 2011, MRI showed, among other results, that Zeigler had disc space narrowing at both the L4-L5 and L5-S1 levels and impingement on the right nerve roots at L4-L5 and impingement on the bilateral nerve roots at L5-S1.  Tr. 294.  However, the ALJ failed to discuss whether this intervening MRI might account for inconsistencies between the March 17, 2011, and October 29, 2011, opinions.  For example, he did not explain nor even appear to consider that Dr. Zaas's October 29, 2011, opinion may be more restrictive than, i.e., inconsistent with, his March 17, 2011, opinion because the August 26, 2011, MRI revealed a worsening condition.  If he did consider the fact that there was an MRI performed between the issuance of the two opinions but found it immaterial or insufficient to explain the differences between the two opinions, the ALJ

---

[13] The ALJ also stated:

> As to his opinion that the claimant is "disabled," that is a determination left to the sole discretion of the Commissioner of the Social Security Administration, or one of his designees, as Dr. Zaas has not had vocational training.
>
> ***
>
> As for the opinion contained in Exhibit 1F, signed by Dr. Zaas, it is given no weight in this case because it is so remote in time, as it was provided about seven years prior to the alleged onset date in this case. (1F/2-3).

Tr. 15-16.

should have provided that explanation.  Without such an explanation, this Court is unable to conduct a meaningful review of the ALJ's decision.

With respect to the ALJ's conclusion that Dr. Zaas's March 17, 2011, and October 29, 2011, opinions were inconsistent with Dr. Zaas's clinical findings, the ALJ did not identify which opinions were inconsistent with which clinical findings. The ALJ briefly discussed Dr. Zaas's treatment of Zeigler.  Tr. 14.  However, the ALJ did not clearly explain whether it was those treatment records that he relied upon to support his conclusion that Dr. Zaas's opinions were inconsistent with his clinical findings and therefore not entitled to controlling weight.  Even if the ALJ was relying on the treatment records and MRI results that he discussed at Tr. 14, the ALJ, in discussing those records, either incorrectly concluded that the August 2011 MRI showed no evidence of nerve root compression and/or failed to explain how he resolved any inconsistencies between Dr. Zaas's treatment notes and the August 2011 MRI results.

For example, the ALJ stated that Zeigler's "low back findings are consistent with a lumbar spine magnetic resonance imaging (MRI) showed degenerative changes and disc bulging at the L4-5 and L5-S1 levels *without evidence of nerve root compression*."  Tr. 14 (emphasis supplied).  In reaching this conclusion, the ALJ cited to the August 26, 2011, MRI results (Tr. 294 (8F/3)), Dr. Zaas's August 30, 2011, treatment notes (Tr. 296 (8F/5)), and Dr. Zaas's September 15, 2011, treatment notes (Tr. 293 (8F/2)).  However, not all of those records clearly support the ALJ's statement that there was no evidence of nerve root compression or that Dr. Zaas's opinions are inconsistent with his clinical findings.  The MRI showed impingement at both the L4-L5 and L5-S1 levels.  Tr. 294.  The impingement at L4-L5 was on the right nerve roots and the impingement at the L5-S1 was on bilateral nerve roots.  Tr. 294.

On August 30, 2011, Dr. Zaas noted that the MRI showed impingement of the nerve roots (Tr. 296) but later, on September 15, 2011, he stated that the MRI did not show evidence of associated nerve root compression (Tr. 293).  It is not for this Court to "resolve conflicts in evidence." *Garner*, 745 F.2d at 387.  However, without further explanation by the ALJ as to how the ALJ resolved possible inconsistencies between Dr. Zaas's August 30, 2011, and September 15, 2011, treatment notes, and/or why, notwithstanding MRI results that showed impingement, the ALJ concluded that there was no evidence of nerve root compression, this Court is unable to conduct a meaningful review of the ALJ's decision, including his conclusion that Dr. Zaas's opinions were inconsistent with his clinical findings and therefore not entitled to controlling weight.

The ALJ's third reason for discounting Dr. Zaas's opinions was that he failed to support *some* of the limitations listed in both opinions.  Tr. 15 (emphasis supplied).  Even though supportability of an opinion is a factor to be considered when determining the weight to be provided to an opinion, the ALJ failed to provide any further discussion. For example, the ALJ did not say which portions he deemed supported or unsupported and he did not provide greater weight to the portions that were supported.

The Court also notes that, while the ALJ provided great weight to the state agency reviewing physicians' RFC assessments, those opinions were provided on February 3, 2011 (Dr. Hinzman) (Tr. 81-83), and May 9, 2011 (Dr. McCloud) (Tr. 93-95), prior to the August 26, 2011, MRI and Dr. Zaas's treatment notes following that MRI.  Thus, to the extent that the ALJ relied on those opinions to discount Dr. Zaas's opinions such reliance was misplaced because they were rendered without a full review of the record.

The reasons offered by the ALJ for not providing controlling weight to Dr. Zaas's opinions are not sufficiently specific to allow this Court to conduct a meaningful review in order to determine whether the ALJ's reasons are "good reasons." Thus, the Court is unable to conclude that there is substantial evidence to support the ALJ's decision. *Cole*, 661 F.3d at 939-940; *see also Wilson*, 378 F.3d at 546-547 (a failure to follow the procedural rules for evaluating treating physician opinions will not be considered harmless error simply because a claimant may appear to have had little chance of success on the merits.) Accordingly, although a more thorough review and explanation of Dr. Zaas's opinions may not result in a finding of disability, in order to insure compliance with the treating physician rule, reversal and remand is warranted for further proceedings consistent with this Opinion.

**B.     Other issues**

Zeigler presents two other arguments. She argues that the ALJ did not properly assess her credibility. Doc. 15, pp. 16-18. She also argues that, because the ALJ failed to give the correct weight to her treating source opinions, he relied upon a faulty VE hypothetical at Step Five. Doc. 15, pp. 16-18. The Court has not addressed these issues because, on remand, the ALJ's further analysis and/or explanation of the opinions of Dr. Zaas under the treating physician rule may impact his findings with regard to Zeigler's RFC, her credibility and his findings under the remaining steps of the sequential analysis. *See Trent v. Astrue*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19 (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

## VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the

Commissioner's decision for further proceedings consistent with this Opinion and Order.


Dated:  February 27, 2014

_____

Kathleen B. Burke
United States Magistrate Judge